**O'NEILL / HASSEN**                                                    Attorneys at Law

February 7, 2025

<u>VIA ECF and Email</u>
Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Nikolaj Sofinskij,* 19 Cr 456 (PKC)

Dear Judge Chen:

As a young boy, Nikolaj Sofinskij faced a number of challenges. The first, sadly, seemed normal to him – a father who worked in the mines, relatives who died in their sixties, and poverty. With that as the backdrop, there were the telephone calls from neighbors who saw his father passed out in the snow on their way home from work. The task of collecting his drunken father fell to him. Often, he'd blearily drag his dad home on his sled for miles in the freezing cold. While this task was arduous for a young boy, the humiliation of having a father who was the town drunk in an area that is well known for its copious alcohol consumption was worse. And then there was the fear and horror of the beatings that would follow when they arrived home. His father was quite egalitarian when it came to violence – first he would beat Nikolay's mother and then it would be his turn. Nikolaj was jealous of his "friends who did not have fathers who were drunks."[1]

As an adult, Nikolaj has tried to become a different type of man. Terrified that he would end up working in the coal mines, like most of the men in his area, he worked hard in school and went to college, hoping to avoid a lifetime deep inside the earth's core. As an adult, he has always been eager to help his neighbors rather than requiring help from them; and, most importantly, he is a loving and devoted father who has instilled in his daughter a valuable lesson – that her life has meaning and purpose. Nikolaj's family and friends, those who know him best, know him to be a dependable, upstanding, hardworking man who devotes his life to his family and his nation, Ukraine.

---

[1] Letter from Nikolaj Sofinskij, attached as Exhibit A.

**1 /** P (212) 203-1858          **4 /** www.oandh.net

**2 /** F (212) 203-1858          **5 /** 25 Eighth Ave, Suite C, Brooklyn, NY 11217

**3 /** grainne@oandh.net          **6 /** 9213 2C82 E6F0 93EA D673 EA30 C7EB 7E03 1B1B 82FA

## Early Years as a Miner's Son

Nikolaj was born in the Sverdlovsk in the Luhansk Oblast, in what was then Yekaterinberg, the mining area of the Soviet Union. He was born in 1980, a year after a horrific anthrax outbreak in Sverdlovsk killed 18 people.[2] The circumstances surrounding the anthrax outbreak are murky, but there was speculation that it was a result of the development of bioweapons. The Luhansk Oblast is the type of place where the development of bioweapons would not be out of the ordinary. The region is used for mining asbestos, coal and other minerals. There, male life expectancy is in the low 60s.

Nikolaj Sofinskij's family identified as Ukrainian and spoke Ukrainian at home, but during the Soviet Union years those distinctions and tensions were suppressed through force, and everyone was required to learn and speak Russian. Luhansk was and remains a very rough area, with high rates of toxic pollution and a low life expectancy.[3]

Nikolaj's father, Peter Sofinskij was a coal miner which subjected him to life in filthy, claustrophobic and dangerous mines. Nikolaj calls it working in the shaft. The coal mining culture in Sverdlovsk revolved around alcohol and abuse, and Nikolaj's father drank to excess morning, noon, and night. He was depressed and violent when he drank – he beat Nikolaj, Nikolaj's brother, Demetri, and their mother Olga. Despite the widespread alcohol abuse among his peers, Nikolag's father stood out among problem drinkers.

---

[2] Matthew Meselson, et al, "The Sverdlovsk Anthrax Outbreak of 1979" 226 Science 1202 (1994).

[3] *See,* O M Korchuganova, et al., "The wastes of Luhansk region chemical and energy enterprises and their impact on the environment." IOP Conf. Ser.: Earth and Environ. Sci. 1049, 012042, available at: https://iopscience.iop.org/article/10.1088/1755-1315/1049/1/012042/pdf, and *see,* Uliana Andrusiv, et al., "The influence of the Ecological Situation in Ukraine on the Life Expectancy and Health of the Population." 43 Jr of the Institute of Landscape Ecology, Slovak Academy of Sciences 2 , 219 (2024), available at: https://intapi.sciendo.com/pdf/10.2478/eko-2024-0023.

O / H

## The Luhansk Oblast Under Siege

Ukraine became independent from the Soviet Union in 1991, when Nikolaj was 11. His father continued to work in the mines, though payment became unreliable. The Soviet Union rationed essentials, but the system of payment was routine. The newly independent government of Ukraine was establishing itself far away in Kiev and the miners in the far west borderland were often not paid for their work. The people in this borderland felt forgotten, and those of Russian descent felt furious that they were under the auspices of Kiev.

Nikolaj's family was forced to resort to secretly and independently digging for coal and scavenging for discarded coal so the family would at least have something to keep them warm. They grew their own food so they would have something to eat; and what they didn't eat, they tried to sell, together with the leftover coal.

Despite the poverty, hunger and violence that defined his young life, Nikolaj got good grades in school, graduated from high school, and was accepted at the University of Luhansk. He studied hard in university and graduated with a bachelor's degree in 2005. He hoped to become a sports trainer or physical education teacher. Boxing was his passion.

Nikolaj met his first wife, Olga Romaschenko in 2007 and they married in Kharkov, Ukraine, an area about 7 hours north of Sverdlovsk a few years later. The couple lived in Luhansk. Nikolaj's mother, Olga died in 2010 when she was 61 of a stroke. Nikolaj was 30.

Nikolaj's wife Olga gave birth to their daughter, ███, the next year in 2011. Work was hard to find in Luhansk. But Nikolaj wanted to raise his family where he had been born. His brother worked in the coal mines where Nikolaj's father worked. While Nikolaj wanted to provide for his family, he feared a life in the freezing underground that he associated with alcoholism and abuse. He found work as a bodyguard and a driver. He also volunteered his time with the Ukrainian border patrol – helping protect Ukraine from the Russian paramilitary armies that were always threatening to invade.

Tensions between the Russians and Ukrainians continued to simmer in 2013; and, in 2014, as ethnically Russian people living in Ukraine, with the backing and firepower of Russia, took over the entire Luhansk Oblast. Nikolaj's work at the border put him and his family at risk. The new Russian government gave Nikolaj the choice of fleeing into Ukraine or prison. As his

**O / H**

family fled to Kharkov with a group of evacuees, Russian soldiers shot at the backs of the fleeing families, killing many.

A friend, Andrey Zhadan who has known Nikolai for more than 20 years, remembers what Nikolaj and his family went through when Luhansk was invaded. "His family was forced to hide in the basements because of the air raids. They had no electricity, no means of communication, no water, no food. Nikolaj did everything possible in order to find food and other necessities for his family and, most importantly, for his daughter. In 2014, Nikolaj committed himself to helping the Ukranian Army."[4]

The next year, at the age of 65, Nikolaj's father, Peter, died of alcohol-related complications and a stroke.

Nikolaj and Olga tried to make their marriage work in Kharkov but they both suffered from depression. Nikolaj had no friends or contacts in the area and the difficult life he had had in Luhansk seemed easy by comparison. Nikolaj was desperate for work to provide something for his family. He had few family or personal connections in Kharkov who could offer him a job. When someone told him he could have a job purchasing electronics in the United States, it seemed too good to be true. Nikolaj was desperate and the harms and consequences seemed far away. He agreed to act as a 'stuffer' – a person who purchased electronics using credit cards without authorization. He had the electronics shipped to addresses of people he didn't know, at the direction of the 'drop manager'. Nikolaj was far from an organizer or leader, and was paid a commission by the 'drop managers' for his work. As he writes in his own letter to the Court,

> We settled in a new city that was controlled by Ukraine where I started to look for a job to support my family because we fled with nothing. It was around this time that I agreed to the deal that brought me to this low point in my life. Not that that's an excuse, but it was a difficult time in Ukraine. The economy was destroyed. All we had was corruption and chaos. Taking money from this business I knew that it was illegal and I knew that people would suffer from it. I always felt that one day I would have to answer for this conduct and pay the price for this. Exhibit A, Letter from Nikolaj Sofinsky.

---

[4] All of the letters of support can be found in Exhibit B.

**O / H**

Olga and Nikolaj divorced around this time. The divorce was amicable and Nikolaj's ability to nurture his relationship with his daughter was not hindered by the divorce. He shared with counsel, with some pride, that he was there for all her major milestones and events – from her first day of school to summer vacations. He felt blessed that his daughter lived with Nikolaj for years after the divorce.

Nikolaj remained in Kharkov and met a new partner, Ievgeniia Butova in 2020. Ievgenia is an emergency room physician. When Ievgeniia met Nikolaj she was taken by what she saw – he was a kind, sensitive and loving man, and she was struck by the closeness of his relationship with his precious daughter. Nikolaj was a doting and caring father. As Ievgeniia became closer to Nikolaj and learned about his father, she was struck by what a dramatic change Nikolaj was able to make in his own family narrative. He was intent on breaking the cycle of violence and despair with his own daughter. Instead of getting drunk, he would help her with her elementary school homework assignments. He wanted to instill in his daughter the kind of things in life that really mattered. Instead of passing out drunk in the snow, he was taking walks with his daughter after school and discussing what she had learned and observed. He wanted her to have a different life, to not know the fear and humiliation that were the mainstays of his childhood. He wanted a happy and fulfilling life for her, where she knew that her father cherished her. He wanted to shield her from the harsh realities in war-torn Ukraine. Ievgennia writes:

> I know him as a kind, sensitive and loving man, who is always ready to lend a helping hand even to strangers. When we met, his 7-year-old daughter ███████ lived with him.[5] We began to spend a lot of time together, and I saw firsthand what a loving and caring father Mykola is. All responsibilities for the child then lay on him and he happily took her to all the clubs, organized leisure time for her, every day walks and doing whatever he could to show his love. He was always ready to support her, listen to her and be there for her… Even when the mother decided to return to living together with her daughter, Mykola still did a huge part in raising the child. Every day he picked his daughter up from school, then took her to clubs or for a walk, and did homework with her. He was

---

[5] Due to the translations and interpretations, some of the names are quite different in the Latin alphabet on the PSR and in the letters.

**O / H**

always present at all holidays and events at school. His daughter spent every weekend and every vacation with us. I don't know a more caring, loving and involved father than Mikola. I know that being away from her is breaking his heart.



Nikolaj stopped working as a stuffer in 2017, when he was able to find work as a taxi driver. Because he'd met Ievegeniia in 2020, right as Covid began to sweep through Ukraine, their early years were stressful, but they had each other's backs. Ievegeniia's work as an emergency room physician was dangerous but essential at this critical time. To support her, Nikolaj assumed the care of her parents (letter from Ievegeniia's mother is also attached as Exhibit B) as she worked increasingly long hours. Like the rest of the world, they thought they could finally take a breath when deaths from COVID started to subside.

Nikolaj tried to give his daughter a normal childhood, enrolled her in specialized English classes and made friends in their new home. A friend, Sergey Gushchin wrote a letter describing his relationship with his friend Nikolaj. Servey writes that Nikolaj had a deep, heartfelt, and sincere relationship with his daughter, and remembers discussing literature with Nikolaj while his own son played with Nikolaj's daughter. The men went to the same Church and Sergey describes Nikolja as a "deeply religious Christian." Another friend who Nikolaj met in Kharkov, Andrii Asmahilov describes Nikolaj as a "kind and compassionate person, always willing to help in difficult situations. He greatly values friendly and respectful relationships. He is a cheerful and lively individual who enjoys sincere conversations. He loves and appreciates sports (and, if he wished, he could make an excellent children's coach)."

Another neighbor who met Nikolaj when he moved to Kharkov describes him as "good, honest, responsible, friendly and law abiding." She says, "we trusted him to take care of our apartment when we had to go out of town on business or on vacation. Nikolaj is a very loving and caring father, who spends a lot of time with his daughter. Even after the divorce, the child lives with him half of the time."

O / H

Nikolaj knew that the Putin government's interest in Ukraine did not stop at the Luhansk Oblast. Putin invaded Ukraine outright, not just the borderlands, in 2022. Nikolaj dreaded rebuilding his life yet again, and this time he was afraid for his daughter and Ievgeniia's family. Ievgeniia wanted to stay in Kharkov and use her medical skills to help the war effort. Nikolaj worked as a taxi driver and cared for his in-laws while Ievgeniia again worked increasingly long hours. Olga took their daughter to the Carpathian Mountains, on the other side of Ukraine, between Slovakia and Romania, where they hoped they'd be  safe. Nikolaj hoped that the Ukrainian army would be able to stop the encroaching Russian army. He worked around the clock helping neighbors, friends, and strangers with whatever they needed. A 75 year old neighbor has written to the Court explaining that, "Nikolay helped me in everything. He chopped the wood, made fire, bought food. We spoke about his family and he told me about it very warmly. We lived side-by-side for a long time. I miss him very much and want to see him again." The bombs got closer, and the family hid in the metro station or in basements – wherever they could find shelter below ground. They watched people killed by bombs on their streets and whole houses destroyed. It seemed both unbelievable and inevitable.

## Arrest and Incarceration

Nikolaj saw his exhausted wife and the increasing frequency of the bombs and knew it was time to flee. They hoped to find refuge in Poland, but at the border, Nikolaj was arrested on a warrant in this case and brought to Vaslui Romanian Prison, on the border of Moldova to face these charges. The prison was the site of large-scale protests where prisoners went on hunger strikes because they were "not given visits, no rations, no rights, we are treated like dogs, help us, if you leave they'd kill us."[6] Nikolaj immediately waived any jurisdictional arguments and consented to extradition to the United States to get out of that prison as fast as possible. Still, it was almost four months before he was brought to the United States.

---

[6] Victor Lupu, "Prison Protests: One Attempted Suicide. 56 Inmates at Vaslui Penitentiary on Hunger Strike" Romania Journal, July 14, 2016, available at: https://www.romaniajournal.ro/society-people/prison-protests-one-attempted-suicide-56-inmates-at-vaslui-penitentiary-on-hunger-strike

**O / H**

He felt happy that the Romanian authorities allowed him to leave and go to America where he felt certain the prison system would be more humane, more sanitary, and dignified. Unfortunately, Nikolaj was brought to Brooklyn, MDC.

Counsel will not bore this Court with details of the horrors that exist at MDC, which is rife with lockdowns, filthy inedible food, medical neglect and violence at every turn. Judge Brown described the prison as having "dangerous, barbaric conditions" in a sentencing decision that outlines some of the shocking conditions which prisoners, like Nikolaj are forced to endure. *United States v. Daniel Colucci,* 23 Cr 417 (GRB) ECF #13, attached as Exhibit C. It has become "routine for judges in both [the Southern] District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC." *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan 4, 2024).

At MDC, inmates like Nikolaj attempt to avoid the violence and hostilities that exist minute-to-minute between warring gangs of prisoners, though he understands hardly anything that he hears because he speaks virtually no English. The gangs monopolize the phones and Nikolaj has nothing with which to barter; thus, communication with his daughter, his ex-wife and Ievegeniia has been extremely challenging. He is utterly alone in MDC without a countryman or anyone to speak his language. There are no Russian or Ukrainian books, television shows, or anyone to talk to in his unit. Miraculous, Nikolaj has been able to attain a program certificate and has a perfectly clear disciplinary record.[7]

Though Ievgeniia remains in Poland, Nikolaj fears that he will likely be deported back to Ukraine where the war is still raging. He hopes that he can be deported to Poland; and, to this end, counsel has been working with Ievegeniia and immigration lawyers in Poland to try to make that happen. Nikolaj hopes that if he can make it to Poland, as a refugee, he will be able to start his life anew, again. It has been nearly two years since Nikolaj was arrested on the Polish border. If he is unable to be deported to Poland, in the best of all possible worlds, he will land in Ukraine – where he will be forced to put on a uniform and fight; and, at worst, he will have to wait in immigration jail for the war to resolve itself.

---

[7] See, Exhibit D certificate from MDC.

O / H

Nikolaj "sincerely regrets his actions," and the pain that his choices has inflicted on the people he loves and the people who suffered because of the criminal activity in which he involved himself. His family and loved ones describe a religious man who dotes on his young daughter, who is a "devoted and honest friend".

Probation recommends a sentence of two years of incarceration. We ask that instead the Court sentence Nikolaj to time served so that he can begin the arduous process of returning to his home to again fight the Russian army or flee and seek asylum in Poland with his family.

Respectfully submitted,


Susan G. Kellman
Grainne E. O'Neill
*Attorneys for Nikolaj Sofinsky*

**O / H**

# Exhibit A

Your Honor,

With your permission I'd like to tell you little bit about myself and my life so you get to know me a little bit before you decide my future. But before I start talking about myself, I would like to apologize to everyone who may have suffered as a consequence to my actions. I also want to apologize to my family, because through my wrongdoing, they have been punished as well, and they just don't deserve that. Nobody that I hurt deserves it and I will carry this burden for the rest of my life. At the same time, I will try to make it better – both to my family and to the victims of my unlawful conduct.

I am very sorry for the things that I did. This was biggest mistake, and lesson, of my life and I will carry it with me for the rest of my life. I will never do anything like this ever again because freedom, family and self-respect are some of the most important things a person can have. My lawyer tells me that you will be fair in deciding my future and for that I am grateful. Life so far away from my family has been so very difficult. But spending that time at the MDC is simply cruel. Lockdowns – and distance –have made it so difficult to communicate with my family. It has been so hard for them – and for me. I beg you to send me home to my family as soon as possible.

I was born in Donbas, Ukraine on December 9, 1980. I grew up with my parents, my older brother and my grandmother. I remember when I was a child we were very poor. My father was making pennies working in shaft and my mother worked in the hospital as a cook. My grandmother was bedridden for as long as I could remember her. Because my parents worked all the time in order to put food on the table, my older brother took on the majority of responsibility – he even helped me with my homework.  That left me with a little bit of time to play outside. I'm forever grateful for that to him. Today my brother lives in an occupied territory in Ukraine, working in the shaft just like our father.

My father was an alcoholic and growing up I remember my parents were fighting all the time. My father was physically and emotionally abusive to all of us. As a youngster, I remember like it was yesterday. He would often beat my mother when he was drunk and when my brother and I tried to defend our mother he would beat us too.  My mother attempted several times to take us away from our father, but we always came back. My father would often get drunk after work. He would fall down somewhere when he was coming home and my brother and I had to go out to find him and carry him home.  It was even worse when it was winter time and freezing temperatures. He would fall asleep in the street where he'd fallen. Sometimes neighbors would find him on the street and they will let us know so we can go and get him. I remember that we would take our sled, because that was the only way we could get our father back to our apartment. Sometimes we had to drag him for miles while barely holding back tears. Once home, I would break down and start crying until my brother or my grandmother would calm me down. I was always jealous of my friends who did not have fathers who were drunks.

At that time Ukraine was part of the Soviet Union. In the Soviet Union electricity was rationed on a schedule and if I did not get my homework done during daylight, studying with the oil lamp was really challenging.

1

I always worried about my parents dying and that I would be left an orphan. I remember one time when our parents gathered our things and took me and my brother to the orphanage. I will never forget the looks on the kids' faces when we arrived. They were happy and sad at the same time. The conditions there were so bad I remember asking my brother if we could take some of the orphans home. I was young, and there were a lot of things I could not understand. There are things in life that I still have difficult time understanding.

I was 15 years old when for the first time in my life I had to deal with life and death situation. All of a sudden, my father's heart stopped. Just a few days before this we buried my grandmother. While I had no experience I had seen people perform CPR so I started to give my father what I thought was CPR. In reality, I was just beating on his chest. I just knew I could not panic. He did not die that day and our family was very happy and we all pray to God for saving his life.

Happy times were few and far between. There is nothing better for a child than a happy family. And now, I can never forgive myself, because my actions are causing my daughter so much pain. I pray every day that we will be united soon.

In the spring of 2010, I also got married and found out what it was like to have a loving family. Unfortunately, later in 2010 my mother left this world. She died of a heart attack. I can't even describe the pain. It was like part of me died at that time. I think that the love I felt from my mother inspired me to be a loving dad for my daughter, who was born in 2012.

Unfortunately, in about 2013-2014 there was a revolution in Ukraine. This triggered. an invasion by Russia and Russia's occupation of Ukrainian territories. At the time I worked as a volunteer with border control. The Russians obtained personal information/documentation about everyone who had worked in these jobs. The Russian authorities gave me an ultimatum – either leave the city or I was going to be arrested and put in prison when nobody would guarantee that I would survive. Consumed with fear, I gathered up my family, we collected a few necessary things that we could carry and left the city. We drove quickly to cross the border. We were the lucky ones – though we didn't feel that lucky.

We settled in a new city that was controlled by Ukraine where I started to look for a job to support my family because we fled with nothing. It was around this time that I agreed to the deal that brought me to this low point in my life. Not that that's an excuse, but it was a difficult time in Ukraine. The economy was destroyed. All we had was corruption and chaos. Taking money from this business I knew that it was illegal and I knew that people would suffer from it. I always felt that one day I would have to answer for this conduct and pay the price for this.

I did my best to support my family, but it wasn't always enough. Unfortunately, after nine years of marriage, my wife and I decided to get divorced. Divorce was amicable and I was able to see my daughter as much as I wanted to and I did. I did everything so my daughter would not be affected by the divorce. I was there for every major event in her life. I was there for her first day of school. I was there for summer vacations and any excursions that she went on.
Now I dream about having a family and more kids with my fiancée Evgenya, who is a doctor.

2

And then – the war. My ex-wife and my daughter managed to get to safety. When the bombs started flying, my fiancée, her parents and I huddled in the basement of our building with our neighbors. My fiancée and I managed to get through those difficult days, weeks and months together – caged like animals. My fiancée was able to escape to Poland.

In June of 2023, I decided to go to Poland to be with my fiancée, but I was arrested on the border and taken to Romanian jail. I was informed about my charges and just like that, I changed from an ordinary citizen to an inmate behind bars. I remembered something my friend said to me – life is like a supermarket you go in you take everything you want but at the end there is a checkout and you have to pay for everything. Every day I think about why I'm here and I realize that the cost of breaking the law was not worth it. The thought that I caused innocent people to suffer is crippling for me.

I hope this letter gives your honor an idea about who I am and you will believe me that I will never ever commit another crime in my life. Once again apologize for what I've done and beg your Honor to allow me to return to my life overseas. I long to be reunited with my fiancée and my beautiful daughter, who I miss more than anything in this world.

Respectfully,

3

# Exhibit B

*Hon. Pamela K. Chen*

*United States District Judge*

*Eastern District of New York*

*225 Cadman Plaza East*

*Brookly, NY 11201*


*Dear Judge Chen:*

I, Andrey Zhadan, am a very close friend of Nikolai Sofinskij. I am an entrepreneur and a businessman. I own hotels in the Ukrainian city of Berdyansk, which at the present time is occupied the Russian troops.

Nikolai and I have known each other for more than 20 years.

I have known him to be kind-hearted, excellent friend, a good family man and a caring father for his daughter.


In 2014 Russia invaded our country and started the war. At that time Nikolai was in the Ukrainian city Lugansk, which was one of the first cities that was shelled, attacked and bombed. Nikolai was married to his first wife at that time and had a two year old daughter. His family was forced to hide in the basements because of the air raids. They had no electricity, no means of communication, no water, no food. Nikolai did everything possible in order to find food and other basic necessities for his family and, most important, for his child. In the same year, 2014 Nikolai was helping the Ukrainian Army.

When the civilians finally were given the chance to leave through what is called "The Green Corridor", Nikolai and his family were able to do so.

After that followed the difficult years of moving through the numerous cities of Ukraine in order to find a place to live and a place to work. The war took everything that they had. It was a very hard test for the family. Shortage of money, unstable work situation – all that led to a rift in the family and eventually – to the divorce.

I know how difficult it was for Nikolai to go through the divorce because he always was an exemplary family man and tried to do whatever it took to save his family.

Nikolai is a loving and caring father. On many occasions I witnessed his relationship with his daughter, including those times when they would come to stay in my hotel during their vacations.

The full-scale war caught up with Nikolai and his present family when they were already living in Khar'kov. For Nicolai events repeated themselves again: the bombing, the shelling, the basements, food and gasoline shortages and another job loss and loss of all means of support.

Nikolai was taking care of and was helping his wife and her elderly parents. He helped them as much as he could and later, when he was able to, he evacuated them abroad.

Nikolai was also doing volunteer work. He was getting bulletproof vests and medications for the emergency room where his wife worked. He was volunteering his time to help wounded warriors.

I know that Nikolai sincerely regrets his actions. I also know that his family impatiently awaits his return, and they are very upset about these events. I hope for the best and I am asking you to show mercy and leniency to my friend Nikolai Sofinskij during his sentencing.

08/24/2024

signed: Zhadan A.A.

_____

By translator: words in English are in *Italics*

26.08.2024

Hon. Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Chen:

**Я , Андрей Жадан , являюсь близким товарищем Николая Софинского. Мое положение в обществе - предприниматель, являюсь владельцем отелей в украинском городе Бердянск, который на данный момент находится под оккупацией российских войск.**

**С Николаем знакомы более 20 лет.**

**Знаю его его как отзывчивого , доброго друга , хорошего семьянина и заботливого отца для своей дочери.**

**В 2014 году на нашу страну напала Россия и развязала войну. Николай находился на тот момент в украинском городе Луганск, который одним из первых подвергся нападению, обстрелам, бомбежкам. Николай состоял на тот момент в своем первом браке и имел 2ух годовалую дочь. Им всей семьей пришлось прятаться в подвалах от обстрелов авиации, находится без света, связи, еды и воды. Николаю всеми возможными способами приходилось доставать еду и вещи первой необходимости для своей семьи и в первую очередь, для ребенка. В том же 2014 году Николай помогал украинской армии.**

**Когда был наконец-то дан зеленый коридор для гражданских лиц , Николаю и его семье удалось выехать.**

**Далее были так же непростые годы скитаний по разным городам Украины в поиске места для жизни и поиска работы. Война тогда забрала все, что было. Это было тяжелым испытанием для семьи. Нехватка денег, отсутствие стабильности в работе привели к разладу в семье и в конечном итоге к разводу.**

**Я знаю, как тяжело Николай переживал развод , так как он всегда был примерным семьянином и старался изо всех сил сохранить семью.**

**Николай заботливый и любящий отец. Я был неоднократно свидетелем его взаимоотношений с дочерью, в том числе, когда они приезжали отдыхать ко мне в гостиницу.**

**Полномасштабная война застала Николая и его теперешнюю семью в Харькове. Для Николая все повторилось. Бомбежки, обстрелы, подвалы дефицит продуктов, бензина и снова потеря работы и всех опор.**

**Николай помогал и заботился о своей жене и ее пожилых родителях. Помогал всем, чем мог и в последствии эвакуировал их заграницу .**

**Николай занимался волонтерской деятельностью. Доставал бронежилеты и медикаменты для отделения скорой помощи, где работала его жена. Занимался волонтерской деятельностью в помощь военным с ранениями.**

**Я знаю, что Николай искренне раскаивается в содеянном. Так же знаю, что его семья очень ждёт его и так же тяжело переживает все эти события. Выражаю надежду и прошу о снисхождении к моему другу Николаю Софинскому при вынесении приговора**

26.08.2024

Жадан А. А.

Scanned by TapScanner

Hon. Pamela K. Chen

United States District Judge

Eastern District of New York

225 Cadman Plaza East

Brooklyn, NY 11201


Dear Judge Chen:

I am Butova Ievgeniia, a doctor of emergency and disaster medicine. My second area of specialization is dermatology. I worked as an emergency doctor for about 7 years, including during the beginning of the full-scale invasion of my country, Ukraine. My emergency department was the first to encounter Russian tanks, since we were practically on the ring road of the city of Kharkov in the direction of the Russian city Belgorod. I am the common-law wife of Mykola Sofinskiy. We have known each other since 2020 and I know him as a kind, sensitive and loving man, who is always ready to lend a helping hand even to strangers. When we met, his 7-year-old daughter ████████ lived with him. We began to spend a lot of time together, and I saw firsthand what a loving and caring father Mykola is. All responsibilities for the child then lay on him and he happily took her to all the clubs, organized leisure time for her, every day walks and doing whatever he could to show his love. He was always ready to support her, listen to her and be there for her. They have an incredibly strong bond as father and child. Even when the mother decided to return to living together with her daughter, Mykola still did a huge part in raising the child. Every day he picked his daugther up from school, then took her to clubs or for a walk, and did homework with her. He was always present at all holidays and events at school. His daughter spent every weekend and every vacation with us. I don&#39;t know a more caring, loving and involved father than Mykola. I know that being away from her is breaking his heart.

In 2020, during the third wave of COVID-19, my entire family (mom, dad and grandmother) became very seriously ill. At that time it was almost impossible to get to the hospital. I looked for every possible way but was denied. At that time, all three members of my family were already experiencing respiratory failure. My grandmother's saturation dropped to 60% and my father's to 70% -- and this is very bad. We had only one apparatus for oxygen support and it was no longer possible to share it between two people. Mykola helped me get medicine all this time. And at the most critical moment, Mykola found a solution and arranged for hospitalization, which saved my father's life. My parents and I will always be grateful to him for this. When the full-scale invasion of our country began, Mykola and I immediately went to my parents for help. His daughter was safe with her mother in the Carpathians Mountains, which lie between the Czech Republic and Romaina. I volunteered to work as an emergency physician in an ambulance and Mykola drove me and picked me up from work everyday, to make sure I was safe. Often I was stuck at work quite late, so Mykola took all the care of my parents upon himself, Since my parents are elderly (my mother was 59 at the time of the start, my father was 72 years old) and they were confused, frightened by everything that was happening, just like everyone who was in the cities that were being bombed and destroyed every day.

It was a very scary period. Our whole family spent 9 days in a basement, unable to come about because of the bombings, with food in short supply. Mykola tried his best to get food and gasoline and was worried about our safety. From the first day of the war, our metro was already crowded with people hiding from bombs and planes. There was no longer enough space for us in the subway, so we were forced to live in the basement along with the other residents of our house. Before our eyes there was a direct hit on a neighboring residential building. People were being killed by bombs on the streets. I continued to work on an ambulance. Everyday, I

picked up wounded children who miraculously managed to survive after getting into their homes. I picked up the corpses from the streets. Our area of the city suffered the greatest attack and destruction at that time, due to its proximity to our border with Russia. It was Mykola who insisted on my leaving Ukraine with my parents, as he was very worried about us. And despite all the hardships of long-distance relationships, there was not a drop of selfishness from him. The only thing he was worried about was our safety. He evacuated us to a safer city. From there we were also able to get to Poland.

I know from speaking with my husband, that he grew up in difficult conditions. His family was poor, his mother worked as a cook in a medical institution, and his father worked in a mine. Unfortunately, his father was an alcoholic and did not care much about the family. Mykola's father abused his wife and did not devote any time to the children. Maybe it is why Mykola is so devoted to his daughter, my parents and myself. I remember Mykola telling me that he and his brother had to try as children to take their father home from the street on a sled, since he often passed out on the street while intoxicated. Under the circumstances, Mykola was forced to go to work after school to help his mother. In 2014, when the war began, Mykola and his family lived in Lugansk. They came face to face with the war. Only then he had a little two-year-old daughter in his arms. Days and nights they hid in basements to avoid the bombings and scavenged for food. When they were given corridors for civilians to exit, the three of them left Lugansk, but they also came under fire and they miraculously managed to leave.

When the war caught up with us in Kharkov and Mykola was not taken into the army, he began to help in any way he could in my emergency department. He got bulletproof vests and helmets for several brigades, since at that time we had no protection. He got medicines and dressings, since at that time we were not provided with this either. Mykola also joined the charitable organization "Nenka

Ukraine", which was engaged in helping our military. I can write a lot more about Mykola, but the main conclusion I want your Honor to draw is that Kolya is a kind,

caring person, who is always ready to help and sincere in his good impulses, as a husband and father. I know that Mykola admitted his guilt and strongly repents what he did. I sincerely believe that he will never repeat his mistakes again. We haven't seen each other for a year and a half and it's very difficult for both him and me, and his young daughter. The only thing we want now is to finally be together, work honestly and strengthen our family. My family and I pray every day that Mykola will be home with us as quickly as possible.

06.09.2024

*LETTER FOR NIKOLAI SOFINSKIJ IN FAVOR OF LENIENCY*

*Hon. Pamela K. Chen*
*United States District Judge*
*Eastern District of New York*
*225 Cadman Plaza East*
*Brookly, NY 11201*


*Dear Judge Chen:*

I, Sergey Gushchin, am a friend of Nicolai Sofinskij. I work as a volunteer in Ukraine, and I am also a self-employed entrepreneur. We met in 2018 in a prep school #116 where his daughter ███ and my son Ivan attended Cambridge English Language Classes. Nikolai was very involved in his daughter's daily school activities: he would take her to school, after classes he would pick her up, he participated in school gatherings, he played with children and helped with school repairs. His relationship with his daughter is deep, heartfelt and sincere. ███ misses him terribly and is awaiting her father's return. With regard to our relationship – Nikolai proved himself to be a devoted and honest friend. We took long walks in the parks, discussed books in the evenings over dinners while our children played with their toys. By the way, he knows how to prepare the most delicious meals into which he puts his soul and his love. We played sports together and we went to the sauna together. Nikolai is a deeply religious Christian. We went to the same church. When Russia started a war against Ukraine, Nikolai became very active in the volunteers' movement in Khar'kov: he was helping single senior citizens, he was saving people who were left behind and homeless animals. I, as his friend, sincerely hope that you will show him mercy and leniency during  his sentencing.

signed

Gushchin S.V.

_____

By translator: words in English are in *Italics*

**LETTERS FOR NIKOLAI SOFINSKIJIN FAVOR OF LENIENCY**

**07.11.2024**

Hon. Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Chen:

**Я Гущин Сергей являюсь другом Николая Софинского. В Украине работаю частным предпринимателем и волонтёром. Познакомились мы в 2018 году в гимназии 116 на кембриджиских курсах английского языка , куда ходила его дочка Лиза и мой сын Иван. Николай ежедневно активно участвовал в школьной жизни дочки : приводил и забирал ее, учавствовать в школьных собраниях, играл с детьми, помогал делать ремонт в школе. У него глубокие ,душевные, искренние отношения с дочкой. Лиза очень скучает и ждёт папу. Что касаемо наших отношений: Николай проявил себя как преданный и честный друг. Мы много гуляли в парках , обсуждали книги вечером за ужином, когда дети игрались в игрушки. Кстати он очень вкусно с любовью готовит еду. Мы ходили вместе на спорт площадки и сауну. Николай является глубоко верующим Христианином. Мы ходили на службу в одну церковь. Когда Россия начала войну против Украины , то Николай активно участвовал в валонтерском движении в городе Харькове: помогал одиноким пенсионерам , спасал брошеных людей и животных . Я, как его друг, искренне надеюсь на ваше снисхождение в вынесении приговора.**

**LETTERS FOR NIKOLAI SOFINSKIJ IN FAVOR OF LENIENCY**

**DATE:09/.09/2024**

Hon. Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201
Dear Judge Chen:

I, Irina Anatolyevna Butova, am a citizen of Ukraine living in the city of Kharkov. I am a nurse by profession. Before retiring, I worked for the International Red Cross.

I met Nikolai Sofinsky about 5 years ago. He is the common-law husband of my daughter Evgeniya Butova. We met at a difficult time for both our family and the country. Since my daughter and I are medical workers, we were among the first to meet COVID-19. Our whole family got sick. In Ukraine, as in the whole world, there was a very difficult situation both with medicines and places in hospitals. Nikolai came to the rescue. He went to all the pharmacies in the city, brought medicines. And when the situation became critical, he was still able to agree on hospitalization. They could not save my mother, but my husband and I recovered. Thanks to Nikolai, I can now write this letter. I am very grateful to Nikolai for his help. After this ordeal, the war began. It was the second invasion. In 2014, I was working for the Red Cross and was accepting refugees from Donbass. And in 2022, Kharkov was already being bombed. Nikolai went to the military registration and enlistment office on the very first day, but he was not called up. My daughter worked in an ambulance. And Nikolai brought the first helmets and bulletproof vests for the ambulance team. There were shortages of food in the city. Nikolai took on all the care of us. And then, sitting in the basement during the bombing, I learned about Nikolai. He is from a poor family, his father abused alcohol and died early. Nikolai started working early, while still in school, to help his mother. But the difficult conditions did not prevent him from graduating from the State University of the city of Lugansk. Nikolai has a daughter from his first marriage. A wonderful girl! Nikolai paid a lot of attention to the upbringing and education of his daughter. I got to know Nikolai as a responsive, kind person who is always able to lend a helping hand. It was Nikolai who insisted that we go to a safe place. We entrusted him with all our property.

I know that Nikolai admitted his guilt. I believe that he repents of what he did and regrets what happened. I am sure that Nikolai will never make such mistakes again. I know that the United States has the strongest and fairest judicial system. I ask the Court to be humane and lenient and believe in Nikolai so that he can return to normal life as soon as possible and start everything from scratch. Give him this chance. I believe in him

*Irina Butova*

Я, Бутова Ирина Анатольевна, гражданка Украины, проживающая в городе Харьков. По специальности я медицинска сестра. До ухода на пенсию я работала в Международном Красном Кресте.

С Николаем Софинским я познакомилась около 5 лет назад.. Он является гражданским мужем моей дочери Бутовой Евгении. Встретились мы с ним в тяжёлое время как для нашей семьи,так и для страны. Так как мы с дочерью медицинские работники, то COVID- 19 встретили одними из первых. Заболела вся наша семья. В Украине, как и во всем мире,была очень тяжелая ситуация как с медикаментами, так и местами в больницах. На помощь пришёл Николай . Ездил по всем аптекам города, привозил медикаменты . А когда ситуация стала критической, смог все - таки договориться о госпитализации в больницу. Маму не смогли спасти, а муж и я выздоровели. Благодаря Николаю я могу сейчас писать это письмо. Я очень благодарна Николаю за его помощь. После этого тяжёлого испытания началсь война. Это было второе вторжение. В 2014 году я, работая в Красном Кресте, принимала беженцев из Донбасса. А в 2022 году уже бомбили Харьков. Николай в первый же день пошёл в военкомат, но его не призвали. Дочь работала на скорой помощи. И первые каски и бронежилеты для бригады скорой помощи привёз Николай. В городе были тяжело с продуктами. Николай всю заботу о нас взял на себя. И вот тогда, сидя в подвале во время бомбежек,я узнала о Николае. Он из бедной семьи, отец злоупотреблял алкоголем и рано умер. Николай рано начал работать, ещё учась в школе, чтобы помагать матери. Но трудные условия не помешали ему закончить Государственный универсисет города Луганска. У Николая есть дочь от первого брака. Замечательная девочка! Николай очень много внимания уделял воспитанию и образованию дочери. Я узнала Николая как отзывчивого, доброго,способного всегда протянуть руку помощи человека. Именно Николай настоял на том,чтобы мы ехали в безопаное место. Мы доверили ему все наше имущество.

Я знаю,что Николай признал свою вину. Я верю, что он раскаивается в содеянном и жалеет о случившемся. Я уверена, что Николай больше никогда не совершит подобных ошибок. Я знаю, что в США самая сильная и справедливая судебная система. Я очень прошу Суд быть гуманным и снисходительным и поверить Николаю, чтобы он как можно скорее вернулся к нормальной жизни и начал все с чистого листа. Дайте ему этот шанс. Я верю в него

LETTERS FOR NIKOLAI SOFINSKIJIN FAVOR OF LENIENCY

07.11.2024

Hon. Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Chen:

**I, Andrii Ismahilov, a citizen of Ukraine residing in Kharkiv, currently serve as a co-owner and technical director of an engineering and construction company. I hold a PhD in Engineering and am an associate professor (previously, I taught engineering subjects for nearly 20 years at the University of Railway Transport in Kharkiv). I have known and been friends with Mykola Sofinsky since 2019 and can provide the following character reference for him.**

**Mykola is a kind and compassionate person, always willing to help in difficult situations. He greatly values friendly and respectful relationships. He is a cheerful and lively individual who enjoys sincere conversations. He loves and appreciates sports (and, if he wished, he could make an excellent children's coach).**

**Mykola deeply loves his only daughter. If he were to have more children, he would undoubtedly be a loving and caring father to them as well. He loves Ukraine and holds strong patriotic beliefs.**

**I hope that the United States court will take my character reference for Mykola Sofinsky into account and deliver a fair and just decision in his case.**

*Hon. Pamela K. Chen*
*United States District Judge*
*Eastern District of New York*
*225 Cadman Plaza East*
*Brookly, NY 11201*


*Dear Judge Chen:*

I, Krivosheyeva, Yelena Borisovna, was born in Ukraine, in the city of Khar'kov. Prior to the start of the full-scale war, I worked as a clothes designer. I have known Nikolai since 2014. That was the year when he and his family were forced to move to Khar'kov due to the unsafe situation in his hometown Lugansk. Since his family did not own any properties in Khar'kov, they rented an apartment which happened to be next to my apartment and that is how we got acquainted.

I can say that in the course of our frequent communications and long standing relationships with Nikolai he proved himself to be a good, honest, responsible, friendly and law abiding man. He has never been seen in the company of suspicious individuals. He is very accommodating, has good communication skills, and is very attentive and friendly to the person he is communicating with. Since our relationship was very friendly and long standing, we trusted him to take care of our apartment when we had to go out of town on business or on vacation.

Nikolai is a very loving and caring father, who spends a lot of time with his daughter. Even after his divorce, the child lives with him half of the time.

I know that Nikolai admitted his guilt and that he is very sorry for what he has done. He wants to reunite with his wife Evgeniya as soon as possible, he wants to start working again and restore his life.

On behalf of my family, we ask you to show leniency and mercy to Nikolai during his sentencing.

11/24/2024                                                        *signed*

_____

By translator: words in English are in *Italics*

Hon. Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Chen:

Я, Кривошеева Елена Борисовна, родилась: Украина ,гХарьков. Да начала полномасштабной войны работала дизайнером одежды.

С Николаем знакома с 2014 года после того, как он с семьей был вынужден переехать в Харьков в связи с небезопасной ситуацией в его родном городе Луганск. Так как собственного жилья в городе Харьков семья не имела, им пришлось арендовать квартиру, которая располагалась по соседству с моей, таким образом и состоялось наше знакомство.

В ходе частого и продолжительного общения с Николаем могу характеризовать его как честного, ответственного, доброго, дружелюбного и законопослушного человека. Никогда не был замечен в компании подозрительных людей. Очень располагает к себе в общении, коммуникабелен, внимателен и добр к собеседнику. Так как наши дружеские отношения были достаточно длительными, Николай часто присматривал за нашей квартирой во время наших отъездов по делам или на отдых. Николай любящий и очень заботливый отец, который очень много времени проводит с дочерью, даже после развода с супругой ребенок половину времени проживает с ним. Я знаю, что Николай признал свою вину и очень раскаивается в содеянном. Он стремится скорее воссоединиться со своей женой Евгений, начать работать и восстанавливать свою жизнь. От лица своей семьи, мы просим Вас о снисхождении к Николаю в вынесении приговора.

24.11.2025

**DATE:** 23/07/2024

Hon. Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Chen:

I, Kovalyova Natalya, as an English language teacher for children. I am 75. On 22nd of February 2022 the war between russia and Ukraine broke out. Kharkiv was the first city that was bombed.  On 23rd of February I had to move to my country house in Chuguyev district. I wasn't ready to go there in winter, but the next day I met Nikolay who lived next house to ours. I felt impossible to do many things because of my age.

But Nikolay helped me in everything. He chopped the wood, made fire, bought food. We spoke about his family and told about it very warmly. We lived side-by-side for a long time. I miss him very much and want to see him again.

# Exhibit C

FILED
CLERK

2:20 pm, Aug 05, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

**MEMORANDUM OF
DECISION &
ORDER**

-against-

DANIEL COLUCCI,                                    23-CR-417 (GRB)

Defendant.
------------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

Most judges would agree that, under ordinary circumstances, sentencing represents their most difficult and complex responsibility: after considering the advisory United States Sentencing Guidelines, a broad array of statutory factors must be carefully applied to the factual circumstances of each case and tailored to the individual defendant in an effort to effect justice and the statutory requisites.  In this case, the determination is further complicated by an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: the dangerous, barbaric conditions that have existed for some time at the Metropolitan Detention Center ("MDC") in Brooklyn.

*Relevant Facts in Determining the Appropriate Sentence*

This case involves a significant tax fraud, including a dozen counts of conviction and nearly $1 million dollars wrongfully diverted from federal taxing authorities.  The defendant misappropriated sums withheld from his employees' paychecks that were intended for tax payments and intentionally failed to make employer matching contributions.  Crimes against the public fisc—funds intended for the maintenance of Government programs to benefit the public good—are very serious.  Yet this crime goes beyond a simple theft of tax monies.  In this case, the defendant took money from the Government and his employees—people who generated

1

income for him through their time and effort on behalf of his business—and who were left holding the idiomatic bag.  They were subject to tax problems, faced IRS reviews and penalties, had Social Security issues and were denied refunds.  When confronted, the defendant lied to them, falsely denied knowledge of his misdeeds and misdirected them to his accountant.   Four of defendant's former employees appeared at the sentencing hearing to describe the impact defendant's machinations had upon them.

In these circumstances, it is this Court's duty to consider the Guidelines, balance the § 3553(a) factors and craft an appropriate sentence—one that is sufficient but not greater than necessary to effect the statutory goals.  The advisory United States Sentencing Guidelines suggest a term of imprisonment of 18 to 24 months.  In this Court's view, this is a case that, particularly in light of nature of the offense, the significant violation of trust, and the need for general deterrence, warrants a term of incarceration.  When this defendant decided to steal close to $1 million of withholdings and related contributions—money that belonged to his employees as well as sums he was obligated to pay to the federal government as the result of operating a profitable enterprise—he must have known that a likely outcome of that decision was a term in a federal prison.  But he did it anyway.  The reasons that the defendant, an individual of substantial means, carried out this scheme, remain something of a mystery.

Though defendant pled guilty, and is getting credit for acceptance of responsibility, there are reasons to question the depth of his remorse.  For example, according to the Pre-Sentence Report, a document the defendant reviewed with his counsel and was given opportunity to correct, his spouse stated that if the defendant were sentenced to incarceration, "her only form of income would be her social security benefits, and she did not think that would be sufficient to support herself."  PSR, Docket Entry ("DE") 7 ¶ 36.  Meanwhile, that same document reports

more than $1.4 million in cash and securities held in accounts solely in the spouse's name, and the couple jointly has a net worth of more than $5 million.  *Id.* ¶ 57.  While the Court does not hold the defendant accountable for misstatements by his spouse, the failure to correct the record proves troubling.  Moreover, that the defendant has substantial assets renders his decision to pilfer nearly $1 million from his employees and the Government inexcusable.  Finally, though the issue has now been remedied, the defendant appeared somewhat reticent to make full restitution in this matter, having delayed making payments for years despite having the means to do so.

At the same time, the Court recognizes that this was aberrant behavior on the part of the defendant in an otherwise productive life, and that he has levels of community support attesting to otherwise good character.  Moreover, the Court must also consider that, at 74, the defendant is at a relatively advanced age and has indication of some medical problems, including a recent cancer diagnosis.  As to that, though, the record is rather scant as to the future medical implications.  On balance, however, the § 3553(a) factors, including the seriousness of the offense, promotion of respect for the law, just punishment, and adequate deterrence to criminal conduct demand that some period of incarceration be imposed.

**The Conditions at MDC**

> *"What are you waiting for, another loss of inmate life?"*
>
> -   Rhonda Barnwell, President,
>     Government Employees, Local 25[1]

At this moment, though, the Court is faced with a problem that lies outside the confines

of this case.  For several years, beginning with the COVID-19 pandemic, allegations have

swirled around the conditions at the MDC, the only federal prison facility in this district and

serving this region.[2]  And this problem affects most bail and sentencing determinations made by

this Court.

The issues at MDC are not limited to circumstances that were necessitated by the COVID

pandemic—a period in which prison officials were forced to resort to extreme measures to

contain a deadly virus that could well have wreaked havoc within their facilities.  As a result of

those circumstances, in which prisoners were regularly subject to 24-hour lockdowns and related

deprivations, it has become "routine for judges in both [the Southern] District and the Eastern

District to give reduced sentences to defendants based on the conditions of confinement in the

MDC."  *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan.

---

[1] Ms. Barnwell posited this ominous interrogatory in an October 2023 memo decrying the staffing shortages and dangerous conditions faced by inmates and correctional officers at MDC. *Chavez*, 2024 WL 50233, at *2 n.9.  Given that there have been *at least two inmate deaths* since Ms. Barnwell's prophetic inquiry, a new question arises: what will it take before the situation is remedied?

[2] Until relatively recently, some pre-trial defendants in this district and the Southern District of New York were housed at the Metropolitan Correctional Center in Manhattan.  That facility was closed in mid-2021 due to deteriorating conditions, and the principal responsibility for housing all inmates from the two districts fell to MDC.  One might expect that, having shuttered MCC, officials of the BOP would shift substantial resources and personnel to MDC, ensuring that the institution would be up to the task.  Alas, this does not appear to have been the case.

4, 2024).  Indeed, the undersigned has frequently and explicitly reduced sentences imposed to help offset the excesses of COVID-era incarceration.

Allegations of inhumane treatment at MDC continue, however, and judges in this district are subject to a steady drumfire of such charges, often uncontested by prosecutors. And these issues continue to affect judicial determinations.  In *United States v. Chavez*, contrary to statutory presumptions, Judge Furman ordered that a narcotics defendant subject to a multi-year sentence remain at liberty pending surrender, based largely on the conditions at MDC.  2024 WL 50233, at *6.  In *United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024), Judge Komitee granted a motion for compassionate release based primarily on the conditions at MDC for a defendant serving time for violating supervised release. *Cf. United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods.").  In yet another case, Judge Cogan indicated that he might have sentenced an offender to incarceration "if not for the length of the sentence landing him in the Bureau of Prison's Metropolitan Detention Center in Brooklyn."[3]

In *Chavez*, Judge Furman identified three areas of concern in the post-COVID conditions at MDC: (1) continued reports of inordinate periods of lockdown, (2) claims that the facility provides inadequate and/or substantially delayed necessary medical care—a particular risk in this case and (3) general issues about the conditions at the facility.  2024 WL 50233, at *5.

---

[3] "'Such a Weird Case': US Judge Sentences Platinum Partners Co-Founder to Six Months Home Confinement," *New York Law Journal*, July 16, 2024, available at https://www.law.com/newyorklawjournal/2024/07/16/such-a-weird-case-us-judge-sentences-platinum-partners-co-founder-to-six-months-home-confinement/?slreturn=20240620105128

Allegations of inadequate supervision, unbridled assaults and lack of sufficient medical care[4] are

supported by an increasing body of evidence, with certain instances that are irrefutable.  *Griffin*,

2024 WL 2891686, at *3 ("it has been well documented that the MDC has an ongoing issue with

frequent lockdowns due to violence and the threat of violence, among other concerns, which has

delayed medical care for a number of inmates").

That critical medical care is frequently delayed or denied within the facility seems no

longer in doubt.  *Id.* (finding that MDC "has delayed medical care for a number of inmates").

On June 4, 2024, Michael Arthus, an assistant federal defender in the Southern District of New

York, wrote a letter to the undersigned concerning a recent incident in which his client, a diabetic

MDC inmate, reported losing consciousness in his cell.  *United States v. Bumpass*, 23-CR-183

(GRB), DE 31-36.  Notably, neither Mr. Arthus nor his client had a role in the case before this

Court.  Due to MDC staffing shortages, Mr. Arthus reports, there were no guards on the unit.  As

a result, a defendant being prosecuted here attempted to summon a corrections officer for help to

no avail and then tried a panic button, which was broken and yielded no results.  While these

conditions—prisoners locked down in housing units without any guards present combined with

inoperable panic buttons—may seem unimaginable, it is well established that such deficits have

been long persisted at MDC.[5]  According to Mr. Arthus, left with no alternatives, the inmate:

---

[4] Some other allegations—by way of example, oft-cited maggots in the food—remain unverified
and may well, based upon some ongoing investigations, turn out to be exaggerated.

[5] *Chavez*, 2024 WL 50233, at *7 n.16 (corrections officer union official reporting that "on a daily
basis housing units are left. unmanned by staff and locked down"); *7 ("the Court was advised
that many, if not most, of the emergency call buttons in the MDC's main building are not
working — even though those buttons are the only way (other than yelling and banging) to call
an officer in emergency situations during a lockdown") (citing Letter from Loretta E. Lynch at 4,
*Federal Defenders of New York, Inc.,* No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF
No. 403 (reporting that the buttons remained "broken" as of November 30, 2023)).

> spent the night nursing my client back to health: he placed cold towels on my
> client's head to wake him up and keep him awake, fed him sweets to bring his
> blood sugar back up, and stayed with him throughout the night to make sure he
> did not lose consciousness again.

*Id.* When individuals are confined in a federal facility, such exceptional acts should not be

required to ensure basic safety and medical care.

While evidence of failures at MDC continues to accumulate, there is no complete public

record of the problem, and the available information is contained in judicial opinions from two

districts and sporadic media reports.  In the pages that follow, the Court has endeavored to

highlight some matters that have come to light recently to make determinations in connection

with the sentencing in this case.  The list is far from comprehensive; in fact, this Court lacks

visibility into the overall issues.  Furthermore, as another judge has previously observed, "there

are far too many cases to cite."  *Chavez*, 2024 WL 50233, at *1 n.3 (collecting "representative

examples" of complaints of lockdowns, dreadful conditions and delayed medical care).

One case before this Court includes incontrovertible evidence submitted by the

Government that highlights chaotic, unremedied lawlessness at the facility.  That matter involves

the prosecution of the "Route Boys," a robbery crew engaged in brazen, systematic thefts of

extremely dangerous narcotics from pharmacies which were sold by members and associates

using social media, including an Instagram account.  The Government has submitted

photographs taken of and by gang members *while in their cells at MDC*, showing off their tattoos and flashing hand signs. *United States v. Lopez Dominguez*, 21-CR-451(GRB), DE 363 at 4.



*Members of the Route Boys posting photos via Instagram using contraband cell phones from inside their cells at MDC*

These photos, apparently created using smuggled contraband cellphones, have been posted on Instagram by gang members from MDC using the very same account the defendants used to sell stolen opioids before their arrest. *Id.*

While submitted to the Court in July 2024, the Government advises that these photos were first shared via several gang Instagram accounts between July and September 2022, approximately two years ago. *Id.*; DE 367 at 4 n.2. That the Government contemporaneously became aware of these activities within MDC and the legal violations, security issues and

possible public corruption attendant thereto is beyond doubt.  *Id.* at 4 ("Each photograph was screen shotted *[sic]* by a law enforcement agent on or about the date that it was posted on the respective Instagram accounts.").  One former MDC corrections officer, arrested in April 2023, was sentenced to 30 months after he "accepted tens of thousands of dollars from inmates in exchange for smuggling narcotics, cigarettes, and cell phones into the MDC."  Statement of United States Attorney Breon Peace, dated July 30, 2024.[6]  Yet, the situation at MDC nevertheless seems unchanged as "[c]ontraband—from drugs to cell phones—is widespread."  *Chavez*, 2024 WL 50233, at \*1 (collecting cases and media reports of illicit cellphones within MDC).[7]  The results of such anarchy are predictable.

### *"Unchecked Violence" at MDC*

Chaos reigns, along with uncontrolled violence.  *Griffin*, 2024 WL 2891686 at \*3 (describing rampant "violence and the threat of violence" at MDC).  Through review of sealed documents, official government statements, judicial opinions and news media reports, this Court has identified shocking instances of brutal violence within the facility.  This review is necessarily limited, as the Court's access to relevant information was exceptionally narrow.  In other words, there were, most certainly, other incidents not collected during this Court's review.  Nevertheless, the results are staggering.

---

[6] Available at https://www.justice.gov/usao-edny/pr/former-federal-correction-officer-sentenced-prison-accepting-bribes-exchange-smuggling.

[7] In sealed, sworn documents filed with this Court, one defendant (Defendant 1) housed at MDC beginning in early 2024, raised detailed allegations documenting the ready availability of narcotics and weapons among MDC inmates, and of corrupt guards permitting the acquisition and use of cellphones by gang leaders, warning inmates about impending searches and permitting sexual and physical assaults within the facility.  While some of these sworn allegations have not been independently verified, others are supported by corroborating evidence, and investigation of certain claims is continuing.  The Government advised that at least some of Defendant 1's information was deemed credible.  To avoid risk of retaliation, Defendant 1 will not be further identified herein.

Each of the five months preceding this opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim.  One knife attack was captured on a surveillance video producing images that are horrifying beyond words.  The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as-yet-unidentified "brawls."  A summary of the available facts underlying each of these events follows:

**March 2024** - Defendant 2 was awaiting sentencing for conviction on a single firearms possession count.[8]  According to sealed filings by Defendant 2, his attorney and the United States Probation Department, Defendant 2 reports being stabbed repeatedly at MDC in March 2024, sustaining wounds to both arms, his abdomen and one knee.  The defendant reports receiving no medical care, but instead was simply locked in a cell in the Secure Housing Unit (SHU) for 25 days.  His attorney, an assistant federal defender, advised that the defendant had been attacked while resisting a robbery in the facility by gang members.

---

[8] To avoid risk of retaliatory violence, identifying details regarding Defendant 2 are not provided herein.

10

**April 2024** - According to information and photographs filed by the United States

Attorney in a criminal prosecution, three members of the MS-13 housed at the MDC attacked a fourth inmate with improvised knives, inflicting 44 stab wounds on his back, chest, abdomen, right arm and leg. *United States v. Rivas*, 18-CR-398(RPK), DE 363. The entire, brutal attack was captured on video. *Id.* That video, filed by the Government and recently made public, displays the lengthy, horrific assault, committed by inmates under no



apparent supervision. Reports suggest that the leader of the attack, serving 35 years for a near decapitation in an internecine gang dispute, is also serving time for stabbing a rival gang member in an NYC jail. "Unchecked Violence," *New York Daily News*, July 28, 2024. Viewing the security video footage[9] reveals many things: the three inmates perpetrated this organized, armed attack in an open area unimpeded by any supervision, the response to the event took an unconscionably long time, and the victim, suffering from 44 knife wounds, was left unaided while a few outnumbered corrections officers eventually attempted to pursue the attackers.

**May 2024 –** Christian Griffin had served about five weeks of a 90-day sentence at MDC for shoplifting while on supervised release. *Griffin*, 2024 WL 2891686 at *1. On May 15, he advised a corrections officer on his unit of a belief that he was in danger, requesting transfer to another unit. *Id.* No such action was taken. The next day, three inmates physically assaulted and severely beat Griffin, leaving him with "a fracture of the right orbital bone—a broken eye

---

[9] The video is available at https://www.nydailynews.com/2024/07/27/see-it-video-from-inside-troubled-brooklyn-federal-jail-mdc-shows-brutal-gang-stabbing/.

socket, in layman's terms—as well as a laceration to his right eye and swelling and bruising of the eye and face." *Id.* at \*2.  He was treated at a hospital, where doctors advised that he required an ophthalmological consult and possible follow-up surgery.  While his face remained swollen and painful for weeks thereafter, MDC failed to provide any appropriate medical care. *Id.*

**June 2024 -** Extensive media reports indicate that on June 7, 2024, an inmate named Uriel Whyte was fatally stabbed in the neck in a dispute over drugs within the confines of the facility.[10]  In a letter to my colleague, Judge Azrack, who presided over Whyte's prosecution, the Government confirmed only that Mr. Whyte had "passed away."  *United States v. Whyte*, 21-CR-390(JMA), DE 52.  The death of Mr. Whyte appears to be subject of an ongoing investigation, yet there seems to be little doubt that Mr. Whyte was slain while at MDC.

---

[10] "Inmates Decry Conditions Inside Brooklyn Jail," *Spectrum News NY1*, available at https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions; Annese, J., "Inmate at Brooklyn's troubled Metropolitan Detention Center is stabbed to death: sources," *New York Daily News*, June 20, 2024.

**July 2024 -** About six weeks after the Whyte killing, on July 17, 2024, the Court was advised of a lockdown of the facility based upon a "grave security situation." Subsequent reports revealed that this situation was, in fact, the apparent killing of another inmate during a physical altercation among prisoners housed at MDC. *See, e.g.*, Fadulu, L., "Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail," *The New York Times*, July 17, 2024.[11] For days afterwards, the BOP website reflected that the facility remained on lockdown, as the site read "All visiting at this facility has been suspended until further notice." This presumably arose from the second fatal attack upon an inmate at the facility in the space of six weeks.



MDC Brooklyn
An administrative security metropolitan detention center.

Taken together, these incidents demonstrate a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement. And these conditions bear heavily on the determination by the Court in this case.

*Relation to the Instant Sentencing Problem*

If the Court imposes a sentence of a year or less in this case, the Bureau of Prisons ("BOP") may well direct that the sentence be served at the MDC. Under current practice, immediate surrender of the defendant makes this possibility more likely, however, even if the

---

[11] Available at https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html

Court were to delay surrender until designation, the defendant may still be designated to serve the time imposed at MDC.  Given the age and medical condition of this defendant, such an outcome would offer unacceptable risks and would be inconsistent with the mandate to provide a sentence that is sufficient but not greater than necessary to satisfy the purposes of the sentencing statutes.

At the same time, this Court is precluded from designating a particular institution for the service of a sentence.  Section 3621(b) of Title 18, United States Code provides that the "Bureau of Prisons shall designate the place of the prisoner's imprisonment" and cautions that "a designation of a place of imprisonment under this subsection is not reviewable by any court."  In other words, "courts lack the authority to designate a defendant's place of incarceration when the defendant is sentenced to a term of prison."  *United States v. Guiro*, 887 F. Supp. 66, 69 (E.D.N.Y. 1995)

As noted, the Sentencing Guidelines carry an advisory sentence of 18 to 24 months, and the Government advocates for a 15 month sentence.  Defense counsel has suggested that this Court should impose no period of incarceration, arguing among other things that other judges in the Eastern District of New York have opted to forgo short periods of incarceration because of the risks at MDC.  Indeed, sentencing arguments based on the reportedly deplorable conditions at MDC have become so commonplace that—quite understandably—counsel routinely raise the issue in a shorthand fashion, as lawyers and judges have grown weary of extended articulation. *See, e.g.*, *United States v. Hernandez*, 23-CR-530 (GRB), DE 18 at 3 ("I will not belabor the horrific conditions of the MDC to this Court, as Your Honor is well aware of the national disgrace it has become.").

These circumstances present a conundrum.  Evaluating the statutory factors indicates that a sentence of incarceration is warranted.  On the other hand, the defendant, like the defendant in *Chavez*, is over 70 years of age, faces significant health challenges and has no criminal record.  Thus, a sentence of incarceration imposed, if that sentence would be served at the MDC, would most assuredly be excessive under § 3553.  *Griffin*, 2024 WL 2891686, at *3 ("In the end, the most important part of the instant Section 3553(a) analysis is that the most 'effective manner' of correctional treatment in this case did not include a fractured eye socket.").  As such, the possibility that the defendant would be designated to MDC for some or all of the sentence proves, under present circumstances, unacceptable.

Thus, the defendant is hereby sentenced to a term of imprisonment of nine months.  The defendant will remain on bail and pre-trial supervision under the same terms and conditions that have governed his release to this point, until a facility is designated by the BOP for service of his sentence.  Assuming that the BOP designates a facility *other* than the MDC, then matters will proceed accordingly.  However, if the BOP opts to designate MDC as the relevant facility, then the imposed term of imprisonment will be vacated and, in its place, the defendant shall serve nine months of home incarceration with electronic monitoring, with the costs of such to be paid by the defendant.

Providing that a term of incarceration be converted to home confinement in the event the BOP designates MDC as the carceral institution is undoubtedly unusual, yet is rooted in factors specifically incorporated into the statutory scheme.  Several statutory considerations support this outcome.  *See, e.g.*, 18 U.S.C. § 3553(a)(1) (mandating consideration of the "characteristics of the defendant"); § 3553(a)(1)(A) (need to consider "just punishment"); § 3553(a)(2)(D) (requiring sentencing court to consider defendant's "needed . . . medical care"); § 3553(a)(3)

15

("the kinds of sentences available"); *Griffin*, 2024 WL 2891686, at *3 (basing compassionate release from MDC on § 3553(a)(2)(D)'s command that "the sentence must also account for the defendant's 'medical care' needs and, more generally, the need to provide 'correctional treatment in the most effective manner.'").

Congress has required that sentencing courts consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). The disparity factor encompasses a national measure, rather than one limited to local or case-specific comparisons. *United States v. Stewart*, No. 23-6330-CR, 2024 WL 3517853, at *2 (2d Cir. July 24, 2024) ("The primary purpose of Section 3553(a)(6) is 'to minimize nationwide disparities.'"). This factor applies with particular force to this case. A tax offender who is similarly—or even identically—situated to the defendant located anywhere else would not be sentenced to a term of incarceration at the MDC. For all of the reasons discussed herein, the present conditions at MDC make such a sentence materially different than one served at a jail or prison elsewhere in the United States that is appropriately managed. A sentence served at MDC is materially different and necessarily disparate from one served elsewhere. Thus, the sentence imposed represents the best approach the Court can fashion under the circumstances to effect all the statutory purposes.

In addition to the foregoing, the Court imposes restitution in the amount of $554,241, a fine of $120,000 and $1,200 special assessment. I will not impose supervised release subsequent to the term of imprisonment as I do not believe that it will serve any of the purposes of the sentencing statute. I find, taken together, this sentence is sufficient but not greater than

necessary to comply with the purposes of the guidelines and the statutory scheme while

reflecting the seriousness of the crime.

   **SO ORDERED.**

   Dated: Central Islip, New York
              August 5, 2024


                                             /s/ Gary R. Brown
                                             GARY R. BROWN
                                             United States District Judge

# Exhibit D



# MDC Brooklyn
# Recreation Department

This is to Certify that

*Nikolaj Sofinkij*

*Sentry Class ( Basic Fit)*

*At MDC Brooklyn*

*This certificate is hereby issued this 19ᵗʰ day of February 2024*

*D. Outlaw*

*Recreation Specialist*

